IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:19-CR-914HEA(ncc) |
| | ) |
| PORTIA LINDSEY | ) |
| | ) |
| Defendant. | ) |

## MOTION TO RECONSIDER BOND DETERMINATION AND FOR IMMEDIATE RELEASE

Defendant moves the Court for a bail hearing and an order granting her release.  Portia Lindsey, who is a pretrial defendant currently detained at the St. Louis City Justice Center, is within the group of people the Centers for Disease Control and Prevention ("CDC") has categorized as most-at-risk for contracting COVID-19, a dangerous illness spreading rapidly across the world, through Missouri, and within the St. Louis region.  The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).  The health risk to Portia Lindsey is because of her high blood pressure and other health conditions.  Given the conditions at the St. Louis City Justice Center, as described in detail below, necessitates her temporary release on bail until this pandemic has ended.  Ms. Lindsey was previously granted bond with the condition she not contact her

1

former boyfriend.  Prior to releasing from jail, the government learned she had contacted him via telephone.  If released, Ms. Lindsey will abide by all conditions previously set.  She will reside at her mother's address listed in the bond report.

## Factual Background

### *Changed Circumstances: COVID-19 Outbreak*

As of March 12, 2020, the new strain of coronavirus which causes COVID-19, has infected over 132,300 people, leading to at least 4,954 deaths worldwide.[1]  On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[2]  Governor Parson declared a State of Emergency on March 13, 2020.[3] Mayor Krewson declared a State of Emergency in the City of St. Louis on March 12, 2020.[4]  St. Louis County has also declared a State of Emergency.[5] Officials in the City of St. Louis, St. Louis County, St. Charles County, and St. Clair County and Madison County in Illinois have banned events and social gatherings of more than 50 people to slow the spread of COVID-19.[6] President Trump has released

---

[1] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 12, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).
[2] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020), *available at* https://bit.ly/2W8dwpS.
[3] Press Release, Missouri Governor Michael L. Parson, Governor Parson Signs Executive Order 20-02 Declaring a State of Emergency in Missouri (March 13, 2020), *available at* https://governor.mo.gov/press-releases/archive/governor-parson-signs-executive-order-20-02-declaring-state-emergency (last accessed March 16, 2020).
[4] *Events of 1,000 People Prohibited in St. Louis; Mayor Declares Public Health Emergency*, St. Louis Post-Dispatch (March 12, 2020).
[5] *St. Louis County Declares State of Emergency, Bans Crowds of 250 People or More*, KMOV (March 13, 2020), *available* at https://www.kmov.com/news/st-louis-county-coronavirus-restrictions/article_c6f8df4c-64aa-11ea-905e-d7faf21d6c31.html (last accessed March 16, 2020).
[6] *No School, No Social Gatherings of More than 50 Across St. Louis as Coronavirus*

guidelines to slow the spread of the coronavirus, including closing schools and avoiding groups of more than 10 people, discretionary travel, bars, restaurants, and food courts.[7] As of March 16, 2020, there were nine positive cases of the virus in the state of Missouri, two of which were in St. Louis County.[8] The County has since announced a third case, and the City of St. Louis has announced its first case.[9]

The CDC has issued guidance that individuals at higher risk of contracting COVID-19 take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[10] People at high risk of having serious illness if they contract COVID-19 include people over 60 years old, and people of any age with underlying medical conditions such as diabetes, chronic respiratory disease and COPD, cardiovascular disease, cancer, or who are immunocompromised.[11] Pregnant and nursing women are also potentially vulnerable, although the CDC does not currently know whether pregnant women

---

*Fight Escalates*, St. Louis Post-Dispatch (March 16, 2020).
[7] *Trump Released National Guidelines to Control the Virus,* New York Times, The Coronavirus Outbreak, Live Updates (March 16, 2020).
[8] *Count of COVID-19 in Missouri Grows to Six*, St. Louis Post-Dispatch (March 16, 2020).
[9] Taylor Tiamoyo Harris, *St. Louis University Student Tests Positive for Virus*, St. Louis Post-Dispatch (March 17, 2020).
[10] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) *at* https://bit.ly/2vgUt1P.
[11] *Who Is at Higher Risk?*, CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html#who-is-higher-risk (last accessed March 14, 2020); *Q&A on Coronaviruses (COVID-19),* World Health Organization, *available at* https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last accessed March 14, 2020); *Novel Coronavirus (COVID-19) Interim Guidance for Social Distancing* (March 10, 2020), *available at* https://cchealth.org/coronavirus/pdf/COVID-19-Interim-Guidance-for-Social-Distancing.pdf (last accessed March 14, 2020)

have a greater chance of contracting the virus, whether the virus cases problems during pregnancy or post-birth health problems, or whether nursing mothers can transmit the virus through breast milk.[12] With confirmed cases in Missouri and metropolitan St. Louis that indicate potential community spread, we must take every necessary action to protect vulnerable populations and the community at large.

### *Conditions of Confinement and Spread of Coronavirus*

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[13] Inmates entering or at local detention facilities may have recently traveled throughout the world and the country, and people who work in the facilities leave and return daily, without screening or with hastily implemented screening protocols.

> In America's jails and prisons, people share bathrooms, laundry and eating areas. The toilets in their cells rarely have lids. The toilet tank doubles as the sink for hand washing, tooth brushing and other hygiene. People bunked in the same cell – often as many as four – share these toilets and sinks. Meanwhile, hand sanitizer is not allowed in most prisons because of its alcohol content. Air circulation is nearly always poor. Windows rarely open; soap may only be available if you can pay for it from the commissary.[14]

Incarcerated people have poorer health than the general population, and

---

[12] Information about Coronavirus Disease 2019, Pregnant Woman, CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/prepare/pregnancy-breastfeeding.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fpregnancy-faq.html (last accessed March 14, 2020).

[13] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

[14] Dr. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, New York Times (March 16, 2020).

4

even at the best of times, medical care is limited in federal pretrial detention centers.[15] Many people who are incarcerated also have chronic conditions, like diabetes, asthma, or HIV, which makes them vulnerable to severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[16] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[17] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[18] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[19] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain

---

[15] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

[16] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *available at* https://bit.ly/2W9V6oS.

[17] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

[18] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.

[19] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) *at* https://cnn.it/2W4OpV7.

coronavirus across the country.[20]

### *Specific Conditions at Pretrial Detention Facilities in the Eastern District of Missouri*

Several area facilities where pretrial defendants are detained in this District have proven – repeatedly and recently – that they are unable to protect the health and safety of defendants in their custody. The St. Louis County Justice Center is currently under investigation after five inmates died in custody there in 2019, including one who was too ill to stand up for two days before he was found unresponsive in a cell.[21] Even after jail staff seemed to understand the inmate was "very sick, it took more than eight hours to transport him to the infirmary."[22]

In 2007, a prisoner at the St. Louis Justice Center in the City of St. Louis died from an asthma attack following a delay in letting paramedics into the jail and "substandard" emergency care by staff there; autopsy findings revealed no trace of the drug that jail nurses said they repeatedly administered to ease the inmate's breathing, and when firefighters arrived they found nurses trying to perform CPR

---

[20] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) *at* https://apnews.com/af98b0a38aaabedbcb059092db356697.

[21] Jeremy Kohler, *St. Louis County Releases Reports on Jail Deaths, but Board of Advisors Still out in the Cold*, St. Louis Post-Dispatch (Feb. 5, 2020), *available at* https://www.stltoday.com/news/local/govt-and-politics/st-louis-county-releases-reports-on-jail-deaths-but-board/article_71509d03-48af-5722-b4ed-cac2fe75c0dc.html (last accessed March 16, 2020).

[22] Jeremy Kohler, *Internal Report Says St. Louis County Inmate Who Died Received 'Attentive' Care*, St. Louis Post-Dispatch (Jan. 15, 2020), *available at* https://www.stltoday.com/news/local/crime-and-courts/internal-report-says-st-louis-county-inmate-who-died-received/article_9364a91f-61a6-53cc-b241-bf798408be37.html (last accessed March 16, 2020).

by compressing the inmate's stomach instead of her chest.[23] In 2007, health services at the jail were provided by Correctional Medical Services, now known as Corizon Health; the City of St. Louis Department of Corrections renewed its contract with the company in February 2020.[24]

The Lincoln County Jail recently settled a suit with the mother of a man who died after attempting suicide in the jail; the man was not receiving medications for bipolar disorder and schizophrenia and told a corrections officer he needed his medication and was going to hurt himself.[25] Jail staff placed him in an isolated cell, and the suicide attempt was discovered approximately 40 minutes to one hour later; the prisoner later died of injuries sustained during the attempt.[26]

Pretrial detention facilities in the region have limited or no on-site medical staff and limited space to use for quarantine of sick prisoners; rural facilities may be located some distance from the nearest clinic or hospital. Upon information and belief, Lincoln County currently has one nurse on site, and a medical doctor visits sick cases once a week. St. Charles County Jail Director Daniel Keen stated in May

---

[23] *St. Louis Inmate Dies after Delay in Care*, Journal of Emergency Medical Services (JEMS), June 6, 2007, *available at* https://www.jems.com/2007/06/06/st-louis-inmate-dies-after-del/ (last accessed March 16, 2020).
[24] *Id.*; Press Release, Corizon Health, *City of St. Louis Renews Corizon Health Partnership* (Feb. 17, 2020), available at http://www.corizonhealth.com/index.php/S=0/Corizon-News/city-of-st.-louis-renews-corizon-health-partnership (last accessed March 16, 2020).
[25] Taylor Tiamoyo Harris, *Mother of Man Who Died After Lincoln County Jail Suicide Attempt Gets $300,000 Settlement*, St. Louis Post-Dispatch (Nov. 8, 2019), *available at* https://www.stltoday.com/news/local/crime-and-courts/mother-of-man-who-died-after-lincoln-county-jail-suicide/article_2ca18672-e141-5a05-908d-8792c91554de.html (last accessed March 16, 2020).
[26] *Id.*

7

2019 that while the medical unit there has been expanded, it needs to be even larger.[27] He also noted that the jail, which was built to hold 220 prisoners, had 420 people in custody at the time, and had housed as many as 500 in recent months.[28] Many detainees in this District are in rural or semi-rural facilities located in areas where it is a challenge to receive healthcare.[29]

It is not clear what precautions local detention facilities are taking to address COVID-19. As of March 15, 2020, the St. Louis County Justice Center was still permitting contact visits with Federal Defender staff. It is not clear when local jails will be able to test prisoners and staff for COVID-19. As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will likely be brought into these facilities and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions. Introduction of the virus into the correctional setting is likely to quickly overwhelm staff, even at facilities that have medical staff on-site, and especially at facilities that do not.

At least one federal judge has denied a remand application in response to the virus. On March 12, 2020, Magistrate Judge Orenstein in the Southern District of New York denied a remand application, holding that increasing the population of

---

[27] Alexis Zotos, *St. Charles County Studying Changes to Jail to Make It Safer, More Efficient*, KMOV (May 14, 2019), *available at* https://www.kmov.com/news/st-charles-county-studying-changes-to-jail-to-make-it/article_9527d7be-76be-11e9-99dc-9b1ba997613d.html (last accessed March 16, 2020).
[28] *Id.*
[29] *See generally* Missouri Department of Health & Senior Services, Missouri Office of Rural Health website, https://health.mo.gov/living/families/ruralhealth/index.php.

8

the Metropolitan Detention Center could present a "danger to the community"—the staff and inmates inside the jail—by potentially bringing the virus into the facility. *United States v. Raihan*, 20-CR-68 (BMC) (S.D.N.Y. Mar. 12, 2020). Corrections facilities in Cook County, Illinois, are considering a program of early releases for detainees who have exceptional health needs due to COVID-19, due to the recognition, as Sheriff Tom Dartsaid stated, that detainees are "in a confined area. . . . If we get one infection, we've got a huge problem."[30] The Cuyahoga County Court in Cleveland, Ohio, plans to release hundreds of inmates from the Cuyahoga County Jail in response to the virus; one official noted that the jail may need empty space if some inmates have to be quarantined because of the virus.[31]

## The Bail Reform Act Requires Portial Lindsey's Release

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The circumstances that existed when Portia Lindsey was ordered detained have now changed. There is a pandemic that poses a direct risk to

---

[30] Annie Sweeney, *Cook County Officials Ponder Inmate Release to Ease Coronavirus Concerns at Jail; Advocates Demand State Consider Taking Action*, Chicago Tribune (March 16, 2020), *available at* https://www.chicagotribune.com/coronavirus/ct-coronavirus-illinois-jails-and-prisons-20200316-eztubtw4anehdin7qppaoh4o24-story.html (last accessed March 17, 2020).

[31] *Inmates in Ohio Being Released Due to Concern of Coronavirus Spread*, WJHL (March 14, 2020), *available at* https://www.wjhl.com/coronavirus/inmates-in-ohio-being-released-due-to-concern-of-coronavirus-spread/ (last accessed March 17, 2020).

9

Portia Lindsey that is far greater if she continues to be detained during this public health crisis.

Portia Lindsey is vulnerable because she suffers from High Blood pressure and numerous mental health conditions which are exacerbated by the stress of the prison combined with the current health crisis.

As an initial matter, "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 756 (1987); *United States v. Orta*, 760 F.2d 887, 891-92 (8th Cir. 1985) (en banc) ("Congress envisioned the pretrial detention of only a fraction of accused individuals awaiting trial."); see also U.S. Const. Amend. V & VIII. One charged with a crime is, after all, presumed innocent. *Stack v. Boyle*, 342 U.S. 1, 4 (1951). A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system. *United States v. Montalvo-Murillo*, 495 U.S. 711, 723–24 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Due to the crucial interests involved, it follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *United States v. Rush*, No. S1414CR88RWSSPM, 2017 WL 6541436, at *4 (E.D. Mo. Dec. 1, 2017), report and recommendation adopted, No. 4:14 CR 88 RWS SPM, 2017 WL 6550680 (E.D. Mo. Dec. 21, 2017)

Under the Bail Reform Act, a judicial officer may reopen a detention hearing at any time before trial "if the judicial officer finds that information exists that was

10

not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the [defendant's appearance] as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). In determining whether there are conditions of release that will reasonably assure the safety of the community and the appearance of the defendant, the Court must consider (1) the nature and circumstances of the offense charged, including whether the offense involves a controlled substance, firearm, explosive or destructive device; (2) the weight of the evidence against the person; (3) the history and characteristics of the person including, among other things, the person's character, length of residence in the community, past conduct, history relating to drug or alcohol abuse, criminal history, record concerning appearance at court proceedings, and whether at the time of the current offense or arrest the person was on probation, on parole, or on other release pending completion of sentence for an offense under Federal, State, or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *Rush*, 2017 WL 6541436, at *1 (citing 18 U.S.C. § 3142(g)).

The courts have long recognized that there is no greater necessity than keeping a defendant alive, no matter the charge. As Judge Weinstein held, "We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly. Continued incarceration of this terminally ill defendant threatens both of these fundamental characteristics of our democracy." *United States v. Scarpa*,

11

815 F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"). *See also United States v. Adams*, No. 6:19-mj-00087-MK, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with violation of the Mann Act and possession of child pornography and suffering from diabetes, heart conditions and open sores released on home detention because of his medical conditions); *United States v. Johnston*, No. 17-00046 (RMM) 2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with violation of the Mann Act and in need of colon surgery released to custody of his wife for 21 days); *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (badly wounded defendant released to custody of his relatives).

  This Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Portia Lindsey will yield, relative to the heightened health risks posed to her during this rapidly encroaching pandemic. *See United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively

12

different, substandard conditions to which the Defendant was subjected" in pretrial detention).

### Conditions of Release Are Available That Allow Portia Lindsey To Be Treated Humanely While Also Ameliorating Any Danger To The Community

From Portia Lindsey's perspective her life—not only her liberty—is on the line, creating a powerful incentive to abide by any release conditions the Court may impose and changing the calculus that initially led to the denial of bail in this case. Ms. Lindsey has had several months in custody to impress upon her the seriousness of the Court's conditions of bond and understands that any violations can return her directly into custody.

Critically, during this temporary release, Portia Lindsey will not be left to her own devices, but will be supported and monitored by Pretrial Services. Since 2009, Pretrial Services' data has found that only 2.9% of defendants in the highest risk category were re-arrested for a violent crime while on release.[32] The elderly and chronically ill, no matter what crime they are accused of, pose a lower risk of violating supervision, particularly during a global pandemic during which even leaving the house will endanger their lives.

The Court had previously set bond conditions for Ms. Lindsey and she is both willing and able to abide by the conditions previously set and any additional conditions the Court deems appropriate.

---

[32] Thomas H. Cohen, Christopher T. Lowenkamp, and William E. Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary* (September 2018) *at* https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.

13

## Conclusion

Portia Lindsey is facing a non-violent offense and is among the vulnerable population at heightened risk of getting very sick from this illness. For all of the above reasons, Portia Lindsey should be granted release on bond.

                                  Respectfully submitted,

                                  /s/Diane Dragan
                                  DIANE L. DRAGAN
                                  Assistant Federal Public Defender
                                  1010 Market Street, Suite 200
                                  St. Louis, Missouri 63101
                                  Telephone: (314) 241-1255
                                  Fax: (314) 421-3177
                                  E-mail: Diane_Dragan@fd.org

                                  ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2020, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Tracy Berry, Assistant United States Attorney.

                                  /s/ Diane Dragan
                                  DIANE DRAGAN
                                  Assistant Federal Public Defender